**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 19-cv-0481-WJM-KMT

CENTRAL BANCORP, INC.,

      Plaintiff,

v.

CENTRAL BANCOMPANY, INC.,
THE CENTRAL TRUST BANK, and
MORTGAGE CENTRAL, LLC,

      Defendants.

---

**ORDER GRANTING PRELIMINARY INJUNCTION IN PART**

---

Plaintiff Central Bancorp, Inc., operates a full-service bank under the name "Central Bank & Trust" in Colorado Springs. A little more than five miles away, but still in Colorado Springs, Defendants recently opened a bank branch under the name "Central Bank." Plaintiff now sues Defendants for trademark infringement and unfair competition, seeking to bar Defendants from operating branches anywhere in Colorado under a name that includes the word "Central."

Currently before the Court is Plaintiff's Motion for Preliminary Injunction (ECF No. 16) and associated briefing (ECF Nos. 32, 43, 53, 54). The Court held an evidentiary hearing on May 1, 2019. For the reasons explained below, the Court finds that Plaintiff is entitled to a preliminary injunction against Defendants' use of "Central Bank" or "Central Trust Bank" in El Paso County, but not in the entire state of Colorado. Such an injunction is conditioned on a $100,000 bond from Plaintiff.

Because Defendants cannot simply change the name of their Colorado Springs branch overnight (due to the need for regulatory approval, at a minimum), the Court will order Defendants to begin the planning process for a name change and to submit a status report with a realistic timeline for carrying out the name change.

## I. BACKGROUND

From the testimony and exhibits received at the hearing, the Court finds as follows. Because the parties dispute which of them is the senior user of the "Central Bank" mark in Colorado, the Court will present the facts in strict chronological order.

### A. Defendants' Missouri Origins

Defendant Central Bancompany is a bank holding company that owns and controls Defendant Central Trust Bank and Defendant Mortgage Central, LLC. Central Trust Bank began as the Central Missouri Trust Company in Jefferson City, Missouri, in 1902. In the late 1960s, it changed its name to Central Trust Bank. In 1987, it received permission from the appropriate regulators to operate under the name "Central Bank." Throughout, it has remained headquartered in Jefferson City and has a significant, visible presence in Missouri. For example, it has had extensive business dealings with the Missouri state government, and it is the official banking sponsor of the St. Louis Cardinals and the University of Missouri—meaning that a person wanting to have Cardinals-themed or Mizzou-themed checks or debit cards must go through Central Bank.

Central Bancompany also owns and controls Jefferson Bank, which is not a defendant here. Jefferson Bank operates exclusively in Jefferson City under its own branding.

**B.** **Defendants' Operations in Colorado Before 2010**

      1.    <u>FSA Servicing</u>

Beginning in 1998, Defendant Central Trust Bank became the Flexible Spending

Account (FSA) servicer for Colorado state employees, other than University of Colorado

employees; and in 2004, became the FSA servicer for University of Colorado

employees as well. In practical application, this meant that an employee with an FSA

would submit a claim for reimbursement through a company called ASI Flex, which is

not owned or controlled by Defendants. ASI Flex would determine eligibility for

reimbursement, and Central Trust Bank (using the name "Central Bank") would fund

any reimbursement, usually through a mailed check. The following check image,

although dated in 2012, is a representative of what such a check would have looked like

during the relevant time period (*i.e.*, before Plaintiff began operations in January 2010):



(Defendants' Exhibit ("DX") S.) As will become clear below, the stylized flower logo at

the top, just left of center, is meant to represent a dogwood flower and is now

Defendants' federally registered trademark and a ubiquitous part of their brand

presence.

Central Trust Bank remains the Colorado state government's and University of Colorado's FSA servicer bank to this day. Together, more than 8,000 employees currently participate in those two FSA programs. Defendants presented no evidence of the enrollment numbers just before Plaintiff began operations in January 2010.

2. Hunting & Fishing License Payment Processing

In the late 1990s, Central Trust Bank developed a system to speed up approval and issuance of hunting and fishing licenses. Previously, standard practice in most states required filling out a form and mailing it in. Central Trust Bank created a process whereby a party seeking a fishing license at a local bait shop, for example, could fill out an application, pay the fee (which was wired to Central Trust Bank), and immediately receive approval, giving the bait shop authority to print a license on the spot. From 2002 through 2008, Central Trust Bank was the contractor for the Colorado Department of Natural Resources to process payments for hunting and fishing licenses under this system. By the end of that term, Central Trust Bank was administering the same system in many other states, including Missouri and Kansas. (DX C at 10.) It had also served Nebraska and Wyoming at some point in the past. (*Id.*)

During the six years Central Trust Bank administered this system in Colorado, about 1,700 vendor shops made it available to license applicants. Employees of those vendor shops operating the license approval system may have had exposure to the name "Central Bank" or "Central Trust Bank," but there is no evidence in the record that license applicants had any notion of Central Trust Bank's role in the process.

3. Servicing Account Holders Living in Colorado

Defendants have records of 3,886 account holders with mailing addresses in

Colorado who interacted or continue to interact with Defendants as "Central Bank," counting from as far back as Defendants' records go (at least the 1950s) until the present, including closed accounts. (DX Z at 1.)[1] These account holders variously held or hold all the sorts of accounts one would expect from a consumer bank (checking, savings, money market, investment, IRA, etc.). (*Id.* at 2–151.) But Defendants' evidence makes it impossible to discern how many individuals began banking with Central Bank before 2010, as opposed to how many accounts were opened before 2010. Also, it is impossible to tell how many individuals interacted with Defendants from El Paso County. In any event, Defendants have acquired most of these account holders through their Missouri connections, *e.g.*, they opened an account in Missouri and then moved to Colorado, or they applied for an account with Defendants to get Cardinals-branded checks.

Over the years, Defendants also have loaned money to Colorado residents, or persons buying real property in Colorado. (DX A-1.) The vast majority of this lending has occurred since 2010. (*See id.*) Some of it has been to residents of, or related to property in, El Paso County, but little or none of that lending took place before 2010. (*Id.*)

**C.      Plaintiff's Operations in El Paso County**

1.      Inception

Plaintiff is a bank holding company formed in 2006 with the intent to start a new bank in Colorado Springs. The application to start that bank, however, got bogged down in the FDIC approval process, so Plaintiff pursued a different strategy. It acquired

---

[1] This page from Exhibit Z shows a total of 4,051 account holders, but 165 of those were account holders with Jefferson Bank, not Central Bank.

an existing—and therefore already FDIC-approved—bank in New Mexico known as Farmers & Stockmens Bank. It then established "Central Bank & Trust" in Colorado Springs as a branch of Farmers & Stockmens Bank.

2. Operations as "Central Bank & Trust" Since January 2010

Central Bank & Trust opened its doors at 1 South Nevada Avenue, Colorado Springs, in January 2010, and has remained there ever since. It has no other branches in Colorado. The hearing evidence established that, as banks go, it is a fairly small operation, with two tellers, about twenty walk-in customers per day, about six package deliveries per week, and $100 million in deposits.[2] Through a mortgage division, it closes between fifteen and thirty mortgage loans per month. Most of Central Bank & Trust's primary commercial banking business is in El Paso County, although it has some statewide recognition as an SBA lender.

Since the beginning, Central Bank & Trust has represented itself to the public under the following mark, which it has never federally registered:



(ECF No. 43-1 at 10.) On the exterior of its Colorado Springs office, it uses a variant of the logo where the words and the mountain logo are separated by some of the

---

[2] The bank is small enough, in fact, that Plaintiff moved to call certain witnesses at the evidentiary hearing out of order "to avoid understaffing problems at Plaintiff's bank that jeopardize some of the bank's important operations for much of the business day." (ECF No. 62 ¶ 1.) More particularly, Plaintiff argued that "it would present an undue burden for Plaintiff to have all witnesses present in Denver at 9am to testify sequentially on the morning of May 1, 2019, because the bank would be understaffed and Plaintiff would be presented with the serious decision about whether to close certain bank operations for at least a portion of that day." (*Id.* ¶ 6.) The Court granted the motion. (ECF No. 63.)

building's windows and lighting fixtures:



(Excerpt from Plaintiff's Exhibit ("PX") 4 at 7.)



(Excerpt from *id.* at 2.)

Plaintiff has advertised and sponsored events in the Colorado Springs community. Some of this advertising is under the "Central Bank & Trust" name and other advertising is under the "Central Bancorp" name (the same logo as above, but with "Central Bancorp" beneath the mountain graphic).

In the Colorado Springs area, the public often refers to "Central Bank & Trust" simply as "Central Bank."

**D.      Federal Registration of Defendants' Mark and Rebranding of Defendants' Various Charters**

By 2014, Defendants were operating banks under various names in Missouri, Illinois, Oklahoma, and Kansas.  Defendants then chose to rebrand all of them, save for Jefferson Bank, as "Central Bank" branches.  Part of that process involved obtaining federal registration of the following mark, which was applied for in September 2014 and officially registered in January 2016:



(Excerpt from DX A-3 at 1.)  The dogwood flower is an integral part of the mark.  (*Id.*)

While the federal application was pending, Defendants went ahead with the changes necessary to convert branches into "Central Bank" branches, including regulatory approval, signage changes, customer notification, and so forth.

**E.      Defendants' Expansion into Colorado**

In 2017, Defendant Mortgage Central opened a loan production office at 5278 North Nevada Avenue, Colorado Springs, about five-and-a-half miles north of Plaintiff's Central Bank & Trust.  A loan production office, or "LPO," finds potential borrowers, helps them to apply for loans, and then forwards the applications to a bank for approval—in this case, to Defendant Central Trust Bank.  The LPO on North Nevada went by the name "Mortgage Central" with an accompanying dogwood flower logo. Beyond the flower logo, Defendant specifically chose not to display any public association with Central Trust Bank or "Central Bank" because it would minimize impact

to Defendants' broader reputation if the LPO failed.

Apparently the LPO did not fail, because Defendants decided in 2018 to convert it into a full-service banking branch under the "Central Bank" brand.  Under a Colorado statute,

> [any] bank or bank holding company that intends to acquire control of any Colorado financial institution or to conduct interstate branching in Colorado shall provide the [state banking division] with the name or names under which it proposes to conduct the business of such bank, bank holding company, or branch.  The bank or bank holding company shall not be eligible to conduct interstate branching or make any such acquisition if the proposed name is either:
>
> > (a) Identical to or deceptively similar to the name of any existing Colorado financial institution; except that this paragraph (a) shall not apply if the bank or bank holding company obtains express written consent of the affected existing Colorado financial institution; or
> >
> > (b) Likely to cause the public to be confused, deceived, or mistaken.

Colo. Rev. Stat. § 11-104-202(8).  Without investigating or otherwise conducting any due diligence into whether any other "Central" banks existed in the area, Defendants submitted the required application under this section, although the application states that the branch would be known as "The Central Trust Bank."  (DX E at 12.)  Defendants also applied for approval from their federal regulator (the Federal Reserve Bank of St. Louis) and the Missouri state banking division.  As part of the approval process, Defendants published a small notice in the *Colorado Springs Gazette* on June 20, 2018, announcing the intent to establish "The Central Trust Bank" at the North Nevada location.  (DX F.)  The Colorado state banking division also likely sent a broadcast e-mail announcing the application to whomever is on an opt-in e-mail distribution list.  In response to a question from the Court, Plaintiff's COO, Mr. Coutts,

stated under oath that he did not know if anyone employed by Plaintiff was on that distribution list but that he would have been made aware of it if an employee had received an e-mail announcing another "Central" bank coming to town.

Sometime in June 2018, or perhaps a little later, the Mortgage Central location on North Nevada changed its signage and began representing itself as "Central Bank." It now appears from the outside as follows:



(DX A-13 at 2.)  It also advertises on a sign near the street showing the various businesses in the shopping center:



(*Id.* at 7.)

Around the same time the North Nevada location converted to "Central Bank," Defendant established "Central Bank" branches in the Denver Tech Center, Pagosa Springs, and Durango.

## F.    Plaintiff's Denver Presence

In October 2018, Plaintiff's leadership approved a plan to expand into the Denver market, and hired a well-known Denver banker to lead that effort. So far, however, Plaintiff's only presence in Denver is a "CB Insurance" office in the Denver Tech Center.

## G.    The Beginnings of this Lawsuit

Plaintiff's employees first learned of Defendants' North Nevada location in January or February 2019. Plaintiff filed this lawsuit on February 19, 2019 (ECF No. 1), filed an amended complaint on February 26, 2019 (ECF No. 15), and moved for a preliminary injunction on February 27, 2019 (ECF No. 16).

* * *

The Court will set forth additional factual findings below as they become relevant to the many issues requiring consideration.

## II.  REQUESTED INJUNCTION

"Plaintiff requests an order enjoining and restraining Defendants *pendente lite* from directly or indirectly conducting business as a full service banking branch located within the State of Colorado under any name or trademark including the term 'Central' or any colorably similar term." (ECF No. 16 at 9.) This request does not extend to Defendants' LPO-only locations (although Plaintiff reserves the right to seek such relief at the end of the suit, through a permanent injunction). (ECF No. 53 at 12 n.9.)[3]

---

[3] It remains unclear to the Court whether Defendants have any LPO-only locations in Colorado, *e.g.*, whether any of the branches outside Colorado Springs go by "Central Bank" but

### III.  PRELIMINARY INJUNCTION STANDARD

**A.      General Standard**

A preliminary injunction is an extraordinary remedy; accordingly, the right to relief must be clear and unequivocal.  *See, e.g.*, *Flood v. ClearOne Commc'ns, Inc.*, 618 F.3d 1110, 1117 (10th Cir. 2010).  A movant must show: (1) a likelihood of success on the merits, (2) a threat of irreparable harm, which (3) outweighs any harm to the non-moving party, and (4) that the injunction would not adversely affect the public interest. *See, e.g.*, *Awad v. Ziriax*, 670 F.3d 1111, 1125 (10th Cir. 2012).  Among those elements, "a showing of probable irreparable harm is the single most important prerequisite."  *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir. 2004) (internal quotation marks omitted).

The Tenth Circuit previously endorsed an alternate standard that relaxed the likelihood of success requirement when the other three factors tipped strongly in the movant's favor.  *See, e.g.*, *Oklahoma ex rel. Okla. Tax Comm'n v. Int'l Registration Plan, Inc.*, 455 F.3d 1107, 1113 (10th Cir. 2006).  The Tenth Circuit abrogated this standard in 2016, announcing that "any modified test which relaxes one of the prongs for preliminary relief and thus deviates from the standard test is impermissible."  *Diné Citizens Against Ruining Our Environment v. Jewell*, 839 F.3d 1276, 1282 (10th Cir. 2016).

**B.      Heightened Standard**

Although the Tenth Circuit has abrogated relaxed standards, the Tenth Circuit continues to endorse a heightened standard for "[d]isfavored preliminary injunctions,"

---

are really LPOs.

which do not

> merely preserve the parties' relative positions pending trial. Instead, a disfavored injunction may exhibit any of three characteristics: (1) it mandates action (rather than prohibiting it), (2) it changes the status quo, or (3) it grants all the relief that the moving party could expect from a trial win. To get a disfavored injunction, the moving party faces a heavier burden on the likelihood-of-success-on-the-merits and the balance-of-harms factors: She must make a strong showing that these tilt in her favor.

*Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 797 (10th Cir. 2019) (citations and internal quotation marks omitted). But the Tenth Circuit has never described the "strong showing" requirement in terms of a quantum of evidence or heightened burden of persuasion (*e.g.*, clear and convincing). Rather, it is a charge to the district court to "more closely scrutinize[]" the likelihood-of-success and balance-of-harms factors "to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course." *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004) (en banc).

## C.    Does Plaintiff Request a "Disfavored" Injunction?

An injunction is "mandatory" if "the requested relief affirmatively requires the nonmovant to act in a particular way, and as a result places the issuing court in a position where it may have to provide ongoing supervision to assure the nonmovant is abiding by the injunction." *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1261 (10th Cir. 2005) (internal quotation marks omitted; alterations incorporated). An injunction changes the status quo if it disrupts "the last peaceable uncontested status existing between the parties before the dispute developed." *Id.* at 1260 (internal quotation marks omitted). Finally, an injunction "grants all the relief that the moving party could expect from a trial win" only if "the effect of the order, once complied with, cannot be

undone." *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1247 (10th Cir. 2001) (internal quotation marks omitted).  If the Court "probably *can* put the toothpaste back in the tube," it is not an "all the relief" sort of injunction.  *Free the Nipple*, 916 F.3d at 798 n.3 (emphasis in original).

Plaintiff says it "is not asking for a 'disfavored injunction'" but then goes on to argue only that its requested injunction would not alter the status quo, because the last peaceable status between the parties was before Defendants started operating under the name "Central Bank" in Colorado.  (ECF No. 16 at 10–11.)  That is probably the correct interpretation of "status quo," but Plaintiff fails to address the other two types of disfavored injunctions.

The Court finds that Plaintiff's requested injunction would be mandatory. Although Plaintiff nominally seeks an injunction only prohibiting the use of the word "Central" as part of Defendants' bank branding in Colorado, this amounts to a mandate that Defendants change their signage, uniforms, letterhead, and so forth.  This "places the [Court] in a position where it may have to provide ongoing supervision to assure [Defendants' are] abiding by the injunction."  *Schrier*, 427 F.3d at 1261.  Accordingly, Plaintiff seeks a disfavored species of preliminary injunction and must make a strong showing on the likelihood-of-success and balance-of-harms factors.

## IV.  LIKELIHOOD OF SUCCESS ON THE MERITS

Plaintiff's first cause of action is for service mark infringement under the Lanham Act:[4]

> Any person who, on or in connection with any goods or

---

[4] Strictly speaking, a "trademark" covers goods, while a "service mark" covers services. But the Lanham Act protection is the same.  *See* 15 U.S.C. § 1127.

services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1). This Court may enforce this provision through an injunction "according to the principles of equity and upon such terms as the court may deem reasonable." *Id.* § 1116(a).

When a plaintiff asserts infringement of an unregistered mark (as in this case), a Lanham Act infringement claim has three elements: (1) the mark is protectable; (2) the defendant used the mark in connection with any goods or services; and (3) the defendant's use of the mark is likely to cause confusion as between the plaintiff's and the defendant's goods or services. *Utah Lighthouse Ministry v. Found. for Apologetic Info. & Research*, 527 F.3d 1045, 1050 (10th Cir. 2008). The three elements are discussed, in turn, below.[5]

---

[5] Plaintiff also brings a common-law trademark infringement claim, and a common-law unfair competition claim. Both claims appear to turn on subsets of the same elements Plaintiff must prove in the Lanham Act claim. Separate discussion is therefore unnecessary.

## A. Element One: Protectible Interest

### 1. Type of Mark

"There are five different categories of terms with respect to the protection of a mark: generic, descriptive, suggestive, arbitrary, and fanciful." *Donchez v. Coors Brewing Co.*, 392 F.3d 1211, 1216 (10th Cir. 2004) (internal quotation marks omitted).

> If a term is generic (the common name for a product or service), it is ineligible for protection because the public has an inherent right to call a product or service by its generic name. A descriptive mark may be eligible for protection, but only if it has acquired a secondary meaning in the minds of the public. Fanciful (made-up words expressly coined to serve as trade or service marks), arbitrary (common words applied in unfamiliar ways), and suggestive marks (words that connote, rather than describe, some quality or characteristic of a product or service) are inherently distinctive, and thus receive the greatest protection against infringement.

*Id.* (internal quotation marks and citations omitted; alterations incorporated). "The categorization of a mark is a factual question" that turns on "the perception of the purchasing public." *Id.* (internal quotation marks omitted).

Defendants argue that "Central Bank" is merely descriptive. "A descriptive term describes a characteristic of a product or service, and is protected only where secondary meaning is shown." *First Savings Bank, F.S.B. v. First Bank Sys., Inc.*, 101 F.3d 645, 654–55 (10th Cir. 1996). Defendants say the "Central Bank" describes a government-established bank that usually controls monetary policy (like the Federal Reserve). (ECF No. 32 at 7.) Thus, Defendants say, Plaintiff must prove secondary meaning.[6] Plaintiff counters that "Central Bank" is suggestive. (ECF No. 43 at 5–6.) A

---

[6] "To acquire a secondary meaning, descriptive words must have been used so long and so exclusively by one producer with reference to his goods or articles that, in that trade and to that branch of the purchasing public, the word or phrase has come to mean that the article is his

suggestive mark "suggests rather than describes a characteristic of the product and requires the consumer to use imagination and perception to determine the product's nature." *First Savings*, 101 F.3d at 655.

The Court finds that Plaintiff is likely to succeed in proving that it has a suggestive, not descriptive, mark. It is highly unlikely that a normal banking consumer would see the title "Central Bank & Trust" and think of something like the Federal Reserve. Rather, "Central" potentially connotes several things about, for example, geography, convenience, and perhaps even importance and stability. It is thus more suggestive than descriptive.

In *First Savings*, the Tenth Circuit held "First Bank" to be "weakly descriptive" because it was "not susceptible to a wealth of meaning" and "describes a bank first in time or quality," similar to descriptive words such as *best*, *superior*, or *preferred*. 101 F.3d at 655. "Central Bank & Trust," however, is susceptible to a broader range of meaning and requires more imagination from the consumer to decide its connotations. On this record, then, Plaintiff is likely to prove that "Central Bank" is suggestive, so secondary meaning is not required.

2.      Seniority

Defendants concede they did not open a full-service banking branch in Colorado under the name "Central Bank" until 2018. In other words, Plaintiff has presented a *prima facie* case of seniority. Defendants nonetheless focus much of their defense on demonstrating that their use of "Central Bank" in Colorado is senior to Plaintiff's use of "Central Bank & Trust." *Cf. MetLife, Inc. v. Metro. Nat'l Bank*, 388 F. Supp. 2d 223, 235

---

product." *Bardahl Oil Co. v. Atomic Oil Co. of Okla.*, 351 F.2d 148, 150 (10th Cir. 1965) (internal quotation marks omitted; alterations incorporated).

(S.D.N.Y. 2005) ("If two or more companies adopt the same mark, basic rules of trademark priority determine use and ownership of the mark." (internal quotation marks omitted)).  Specifically, Defendants have attempted to show that full-service branch banking falls under the "related goods" doctrine, or at least that Colorado is within Defendants' natural zone of geographic expansion.  (ECF No. 32 at 8–9; ECF No. 54 at 2–3.)  The Court will discuss each possibility in turn.

> a.    *Related Goods Doctrine*

Under the related goods doctrine, a plaintiff may sue an entity using a confusingly similar mark on a product or service that the plaintiff does *not* sell if the consuming public could reasonably believe that the defendant's product is the sort of thing the plaintiff might sell: "the appropriate inquiry is whether the goods and services of the parties are related in the minds of consumers, not whether the goods and services are directly competitive."  *HealthONE of Denver, Inc. v. UnitedHealth Grp. Inc.*, 872 F. Supp. 2d 1154, 1182 (D. Colo. 2012).

It is not clear, at least in the Tenth Circuit, that the related goods doctrine can establish priority of use.  *Cf. Helene Curtis Indus., Inc. v. Church & Dwight Co.*, 560 F.2d 1325, 1331 (7th Cir. 1977); *Geoffrey Inc. v. Stratton*, 1990 WL 10072476, at *6 (C.D. Cal. July 25, 1990).  The doctrine is nearly always discussed as part of the likelihood-of-confusion element, and specifically the similarity-of-goods consideration within the likelihood-of-confusion element.  (*See* Part IV.C.4, below.)  *See also HealthONE*, 872 F. Supp. 2d at 1182.  That said, it stands to reason that if Defendants, invoking the related goods doctrine, could have won a trademark infringement claim against Plaintiff when Plaintiff opened Central Bank & Trust in January 2010, then Defendants should be deemed the senior user.

The Court finds that Defendants have not satisfied their burden in this regard. Although Defendants have remotely served banking customers in Colorado since the 1950s, Defendants presented only ambiguous evidence of the extent of their penetration into Colorado, and particularly the penetration and recognition of their mark in El Paso County. (*See* Part I.B.3, above.)

In addition, from what the evidence *does* reveal, most of Defendants' general banking customers in Colorado came to Colorado from Missouri and maintained their banking relationship with Defendants, or specifically sought out Defendants because of the rights accompanying Defendants' Missouri sponsorships. Defendants have provided no authority for the proposition that consumers who view a bank specifically as a Missouri brand—and affiliate with it because of its Missouri connections—can establish that brand's senior rights in another state.

Finally, Defendants' status as FSA servicer bank for Colorado state employees, and former status payment processor for Colorado hunting and fishing licenses, is immaterial. Even if the hunting and fishing license service had not ended in 2008 (before Central Bank & Trust opened), neither that service nor the FSA service exposed Colorado consumers to "Central Bank" as a brand in any appreciable way. For those receiving FSA reimbursement checks, for example, it is unclear how many noticed or even thought about the notion that Central Bank of Jefferson City, Missouri, had issued the check. The dogwood flower logo on those checks actually appears closer to the ASI Flex address and logo than to Central Bank's address. (*See* Part I.B.1, above.) And only employees at hunting and fishing license vendors would have had any reason to see that a bank named "Central Bank" was on the other side of the transaction. There

is no evidence of how many of them actually noticed Central Bank's role or gained any awareness of "Central Bank" as a brand.

For all these reasons, the Court finds that Defendants are unlikely to rebut Plaintiff's *prima facie* case of seniority, and so Plaintiff is likely to succeed in proving that it is the senior user.

        b.    *Natural Zone of Geographic Expansion*

"A senior user that has constantly expanded its business prior to the junior user's adoption of the mark may be entitled to exclusive rights in a zone of natural expansion, even if that zone ousts a junior user from its current territory." *Tana v. Dantanna's*, 611 F.3d 767, 781 n.10 (11th Cir. 2010). Here, if looked at from a nationwide perspective, Defendants are the senior user. But, as far as the evidence before the Court reveals, the closest "Central Bank" to Colorado that Defendants have ever operated before 2018 has been in Lawrence, Kansas, and it did not operate under the "Central Bank" name until 2015 or thereabouts. Even if that bank had been operating as a "Central Bank" before 2010, there is no evidence to suggest that the Colorado Front Range is a zone of natural expansion for a bank from Lawrence, Kansas, particularly for deeply Missouri-based firms such as Defendants.

Accordingly, the Court finds that Defendants are not likely to succeed under the zone-of-natural-expansion principle, and Plaintiff is concomitantly likely to sustain its argument that it is the senior user, at least in El Paso County, despite Defendants' senior use outside of Colorado.

**B.    Element Two: Defendants' Use of the Mark in Connection with Good or Services**

This element is uncontested and uncontestable in light of the evidence recounted

above.  (*See* Part I.E.)  Accordingly, Plaintiff is likely to succeed on the second element

of its Lanham Act claim.

**C.     Element Three: Likelihood of Confusion**

The third and final element of a Lanham Act claim is likelihood of confusion.

Courts in the Tenth Circuit evaluate likelihood of confusion under the following six

factors:

> (a) the degree of similarity between the marks;
>
> (b) the intent of the alleged infringer in adopting its mark;
>
> (c) evidence of actual confusion;
>
> (d) the relation in use and the manner of marketing between the goods or services marketed by the competing parties;
>
> (e) the degree of care likely to be exercised by purchasers; and
>
> (f) the strength or weakness of the marks.

*King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1089–90 (10th Cir.

1999).  "This list is not exhaustive.  All of the factors are interrelated, and no one factor

is dispositive."  *Universal Money Centers, Inc. v. AT&T Co.*, 22 F.3d 1527, 1530 (10th

Cir. 1994) (internal quotation marks omitted).  The ultimate question is whether "an

appreciable number of reasonable buyers are likely to be confused by the similar

marks."  4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*

§ 23:2 (5th ed., Mar. 2019 update) ("*McCarthy*").

The Court will evaluate each of the six factors in turn.

1.     <u>The Degree of Similarity Between the Marks</u>

"The degree of similarity is tested on three levels as encountered in the

marketplace: sight, sound, and meaning."  *First Savings*, 101 F.3d at 653.  By sight, the

parties' marks are easily distinguishable based on typeface, the addition of "& Trust" to Plaintiff's mark, the addition of the stylized mountain graphic to Plaintiff's mark, and the addition of the dogwood graphic to Defendants' mark. By sound, the marks are identical until one reaches the "and Trust" portion of Plaintiff's mark—and it is doubtful how often a normal consumer adds the "and Trust" when referring to Plaintiff. By meaning, the marks are essentially identical. The only possible distinction would be a savvy consumer who understands that "and Trust" means something potentially more.

       2.    <u>Intent of the Alleged Infringer</u>

An inquiry into the defendant's intent is deemed relevant under the presumption that some alleged infringers adopt a similar mark *hoping* that consumers will be confused and thereby mistakenly give their business to the defendant. *See* 4 *McCarthy* § 23:110 ("if defendant intended confusion, this tends to show confusion of customers in fact"). Here, there is no evidence of this sort of intent. Indeed, Defendants operated as "Central Bank" in Missouri many years before creating a Central Bank branch in Colorado Springs.

However, the Court finds it appropriate to consider under this factor Defendants' due diligence, or lack thereof. Both Defendants' general counsel (Mr. Medin) and its executive vice president of marketing and retail banking (Mr. Westhues) testified at the evidentiary hearing that they essentially expect to find other "Central" Banks wherever they might expand (a well-grounded assumption, *see* Part IV.C.6, below), and they simply hope to work it out once they get there. Mr. Westhues testified that some amount of confusion usually does result, at least for a short time, when Defendants expand. Thus, although the Court has no evidence that Defendants expanded into Colorado under the "Central Bank" name in hopes of confusing and drawing away

Plaintiff's customers, it is nonetheless relevant that Defendants expect that their actions will cause confusion, at least temporarily.

3. <u>Evidence of Actual Confusion</u>

"Although by no means strictly necessary, evidence of actual confusion is often considered the best evidence of likelihood of confusion." *First Savings*, 101 F.3d at 656 n.14. The evidentiary hearing established eight uncontroverted instances of actual confusion, as follows:

- In March 2019, Ms. Rockwell, Plaintiff's operations manager for Central Bank & Trust, worked with a mother who was visiting from out of state to drop her son off to attend college in Colorado Springs. The mother had an account with "Central Bank" in her home state and wanted to open an account for her son with the same bank. Ms. Rockwell could not locate an account under the mother's name, and after some discussion, it became clear that the mother had an account with Defendants, not Plaintiff. The mother then departed.

- Also in March 2019, Ms. Rockwell interacted with a man who came in with an insurance check made payable to him, another person, and "Central Trust Bank," and asked that the check be "put back into escrow." Ms. Rockwell confirmed that the man was mistaking Central Bank & Trust for Defendants' Central Bank branch on North Nevada.

- Beginning in late 2018, Central Bank & Trust has noticed a dramatic increase in calls from purported customers having trouble logging into its online banking system. It turns out that most of these customers had

gone to the wrong "Central Bank" website.  Ms. Rockwell was able to determine that "some" of those callers had actually intended to call Defendants' branch on North Nevada.  One of Plaintiff's tellers, however, testified that these confused-customer calls have decreased in frequency since February 2019.

- In February 2019, Plaintiff's operations manager for its mortgage division, Mr. Grebe, received a loan-closing package from a title company. Mr. Grebe could not find the loan in Plaintiff's system.  Upon closer inspection, he saw that the package should have been delivered to Defendants' location on North Nevada.

- Only a few days before the evidentiary hearing, one of Plaintiff's tellers, Ms. Schrepfer, received a phone call from a vendor or a salesperson asking to speak with a person who was not in Plaintiff's phone directory. When Ms. Schrepfer informed the caller as much, the caller provided the person's e-mail address, which was a "centralbank.net" address.  That URL belongs to Defendants.

- On one occasion (timing unclear), Ms. Schrepfer interacted with a customer who came to Central Bank & Trust thinking it was one of Defendants' branches and hoping to cash a check drawn on a bank account held by Defendants.

- On another occasion (timing unclear), Ms. Schrepfer accepted a package delivery containing two keyboards.  When she called Plaintiff's IT department to come retrieve them, the IT department informed her that

they had not ordered any keyboards. She then looked more closely at the delivery address and noticed that it should have been delivered to Defendants' location on North Nevada.

- On one occasion (timing unclear), the manager of Defendants' Colorado operations, Ms. Stout, learned of a customer that came to Defendants' North Nevada location and announced that he or she had first gone to Plaintiff's location accidentally.

Counsel for Defendants characterized this evidence as showing only *de minimis* confusion. *Cf. Sally Beauty Co. v. Beautyco, Inc.*, 304 F.3d 964, 974 (10th Cir. 2002) ("Evidence of actual confusion does not create a genuine issue of fact regarding likelihood of confusion if it is *de minimis*."). But a defendant may not fall back on the concept of *de minimis* confusion unless "(1) the trademarked product and the defendant's product are not physically similar or are not used for similar purposes, or (2) the defendant has put on its own substantial evidence demonstrating no significant actual confusion—for example, testimony from consumers stating that they were not confused." *Beltronics USA, Inc. v. Midwest Inventory Distribution, LLC*, 562 F.3d 1067, 1076 (10th Cir. 2009). Here, "the two products at issue"—Plaintiff's and Defendants' respective full-service banks—"are used in the same manner." *Id.* Moreover, Defendants presented no affirmative evidence of lack of confusion. *See id.* Accordingly, the Court may not disregard the actual confusion presented above as *de minimis*.

Moreover, for a relatively small operation, and one that tries specifically to promote its local community ties, an arguably small amount of confusion has greater

significance. And it makes no difference that some of the confusion has been among non-customers, such as delivery persons. *See* 4 *McCarthy* § 23:5 ("Damage to reputation and good will can be triggered by confusion among non-purchasers. That is, actionable confusion need not be limited to potential purchasers whose confusion could cause a direct loss of sales."). In short, Plaintiff has demonstrated actual confusion that the Court must consider when weighing the likelihood-of-confusion factors.

      4.    <u>The Relation in Use and the Manner of Marketing Between the Goods or Services Marketed by the Competing Parties</u>

The "relation in use and the manner of marketing between the goods or services marketed by the competing parties," *King of the Mountain*, 185 F.3d at 1089, is a question of similarity of products or services, and similarity of marketing. "Typically, the greater the similarity between the products and services, the greater the likelihood of confusion." *Id.* at 1092 (internal quotation marks omitted; alterations incorporated). Here, given that both Plaintiff's and Defendants' respective bank branches are full-service locations, the services offered by Plaintiff and Defendants, respectively, are substantially similar. As for manner of marketing, the Court has seen no exemplars of Plaintiff's and Defendants' recent advertising, nor any evidence regarding the parties' marketing strategies.

      5.    <u>The Degree of Care Likely to be Exercised by Consumers</u>

Defendant claims that banking "is an arena in which consumers pay close attention to their service providers; consumers do not blindly turn their hard-earned money over to an institution without understanding who the institution is." (ECF No. 32 at 11.) This is probably true in the sense that consumers do not blithely ignore the sign on the front of the bank when hoping to transact business with the bank. If they want to

go to Wells Fargo, they go to Wells Fargo; if they want to go to Bank of America, they go to Bank of America. And if a consumer wants to go to Central Bank, the consumer goes to Central Bank—but which one? A sophisticated Colorado Springs consumer, paying attention to signage and other visual cues, would probably *suspect* that the building on North Nevada with the "Central Bank" sign is not related to the building on South Nevada with the "Central Bank & Trust" sign—*if* the consumer *knew* about both locations. But most consumers do not expect to find two banks with—from their perspective—precisely the same name in the same city.[7] Thus, whatever amount of care banking customers normally exercise, it is thwarted to degree the Court cannot ignore in circumstances such as these.

6. <u>Strength or Weakness of the Mark</u>

"A strong trademark is one that is rarely used by parties other than the owner of the trademark, while a weak trademark is one that is often used by other parties." *First Savings*, 101 F.3d at 653 (internal quotation marks and citation omitted). Encroachment upon a strong trademark is more likely to lead to confusion than on a weak trademark. *Id*. In addition, "[t]o assess the relative strength of a mark, one must consider the two aspects of strength: (1) Conceptual Strength: the placement of the mark on the distinctiveness or fanciful-suggestive-descriptive spectrum; and (2) Commercial Strength: the marketplace recognition value of the mark." *King of the Mountain*, 185 F.3d at 1093 (internal quotation marks omitted; alterations incorporated).

"Central Bank & Trust" is a weak mark. It is suggestive rather than arbitrary or

---

[7] Again, to the average consumer, "& Trust" is meaningless. And if a consumer knows that the real name of the North Nevada bank is "Central Trust Bank," then it is even more unlikely that "& Trust" will prompt a consumer to notice a difference.

fanciful.  Moreover, it is common in the banking industry.  According to the Federal Reserve's database of American financial institutions, there are 169 financial institutions in the United States (counting the parties here and their affiliates) that call themselves something beginning with "Central," including numerous other "Central Banks" (or "Central Bank of [location]"), and even a few that add "and Trust."  (*See* DX A-9.)  In the past, there have been multiple "Central Banks" even in El Paso County, including ones with titles like "Central Bank Colorado Springs."  (*See* PX 60 at 1.)  But, according to the same database, there is only one *active* financial institution in Colorado beginning with the word "Central," and that is Central Bancorp (*i.e.*, Plaintiff).  (*Id.* at 3.)

Accordingly, "Central Bank & Trust" has little conceptual strength, but—until Defendants came to town—it was the only "Central Bank" in the state, and had developed substantial recognition in El Paso County through its business dealings, advertising, and sponsorships.

       7.    <u>Synthesis</u>

Again, none of the foregoing factors is considered dispositive.  *Universal Money*, 22 F.3d at 1530.  Weighing them all together, the Court finds that the balance decisively tips toward Plaintiff.  This is so particularly considering the evidence of actual confusion; Defendants' *expectation* that other "Central" banks will exist wherever they expand, likely creating at least temporary confusion; and the fact that Central Bank & Trust on South Nevada and Central Bank on North Nevada offer substantially overlapping services.

However, this conclusion is limited to El Paso County, Colorado.  Plaintiff has failed to present evidence that bank consumers outside of El Paso County are likely to be confused, largely because Plaintiff does not have a physical presence or substantial

recognition outside of El Paso County. *See* 5 McCarthy § 26:29 (discussing territorial extent of unregistered marks). Also, the Court does not find a likelihood of success in barring Defendants' from using "Central" anywhere in their name. (*See* Part II, above.) The Court does not find that "Central Mortgage" (one of the signs on the outside of Defendants' North Nevada location) raises the same concerns as "Central Bank," and the Court can imagine many other bank names that feature "Central" somewhere in the title that would not create a likelihood of confusion with Plaintiff's bank. Plaintiff's likelihood of success is therefore limited to Defendants' use of "Central Bank" and "Central Trust Bank."[8]

Accordingly, having "closely scrutinized" the likelihood-of-success element, *O Centro*, 389 F.3d at 975 Cir. 2004), the Court finds that Plaintiff has made a "strong showing," *Free the Nipple*, 916 F.3d at 797, within the geographic confines of El Paso County regarding Defendants' use of "Central Bank" and "Central Trust Bank."

## V. IRREPARABLE HARM

"What makes an injury 'irreparable' is the inadequacy of, and the difficulty of calculating, a monetary remedy after a full trial." *Id.* at 806. Plaintiff argues that irreparable harm should be presumed when likelihood of success is demonstrated. (ECF No. 16 at 17.) The Court is sympathetic to Plaintiff's argument in this trademark context,[9] but *Diné Citizens* emphatically states that "*any* modified test which relaxes one

---

[8] The Court understands that some documents, particularly legal documents, likely must disclose "Central Trust Bank" as the official bank name. That is not at issue. The question is whether Defendants could rebrand the North Nevada location as "Central Trust Bank," and the answer is no.

[9] In the trademark context, the point is to preserve the distinctiveness of a mark, and *likelihood* of confusion—not necessarily actual confusion—is the injury. *See* 15 U.S.C. § 1125(a)(1)(A). It would be a rare case in which the Court could allow a defendant to continue

of the prongs for preliminary relief and thus deviates from the standard test is impermissible." 839 F.3d at 1282 (emphasis added). Thus, the Court must have evidence of a threatened irreparable harm.

"Evidence of loss of control over business reputation and damage to goodwill could constitute irreparable harm." *Herb Reed Enterprises, LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013). Plaintiff has presented evidence in this regard. In particular, Ms. Rockwell and Ms. Schrepfer testified that callers who call Plaintiff's bank thinking they are calling Defendants' bank often end up confused, flustered, or embarrassed, and sometimes the conversation devolves into an argument. This creates a situation in which Plaintiff's reputation and goodwill are somewhat out of its control.

The Court also agrees with Plaintiff that the time spent having to deal with confused potential or purported customers is an irreparable harm. Some of these calls can take up to fifteen minutes. Theoretically, those minutes could be added up and converted into a dollar figure, but there is also an opportunity cost incurred that is much more difficult to quantify. Every minute spent discerning whether a caller means to call Central Bank & Trust or Central Bank—and if the latter, every minute spent explaining the difference—is a minute Plaintiff's employees cannot spend with current or potential customers. Such opportunity cost, although real, is also very difficult to quantify.

The Court also agrees with Plaintiff, in light of the evidence of actual confusion, that there exists a substantial possibility of the following scenario: Through advertising,

---

using a mark confusingly similar to the plaintiff's and simply set up a forward-looking damages regime to handle the fallout from ongoing confusion. Assuming such a regime is feasible, it would nonetheless destroy the distinctiveness of the plaintiff's mark.

referral, or other means, a person decides she will open an account at, or obtain a loan from, Plaintiff's bank.  She mistakenly takes her business to Defendants' bank, and neither she, Plaintiff's bank, nor Defendants' bank ever learns that she made this mistake—because no one has reason to ask, "Did I/you really intend to visit *this* 'Central Bank'?"  Thus, Plaintiff loses business, yet it is difficult to calculate how much because it is difficult if not impossible to determine how often this scenario has already played out, or in the future will play out absent the injunctive relief Plaintiff seeks.

For all these reasons, the Court finds that Plaintiff established a threat of irreparable harm.

## VI.  BALANCE OF HARMS

Plaintiff has invested substantially in building awareness of itself and its mark in El Paso County, along with its business reputation.  With Defendants' bank on North Nevada, Plaintiff potentially stands to lose some of that investment, and to suffer the irreparable harms noted above.

Against this, the Court must balance the cost to Defendants of requiring the North Nevada bank to operate under another name.  At the evidentiary hearing, Defendants' evidence in this regard was ambiguous and, at times, somewhat misleading to the Court.  Mr. Westhues (Defendants' executive vice president of marketing and retail banking) at first testified in a manner suggesting that forcing the North Nevada location to change its name would be tantamount to forcing the entire Central Bank system to change its name, with all the associated regulatory and structural burdens and costs.  Then, at a later point, he retreated from this position and testified regarding an exhibit showing the conversion of two specific banks to the

31

"Central Bank" name and branding. (*See* DX A-12.) The actual outlays were "$138,141 for App Dev hrs., $14,300 for Infrastructure hrs. and $16,445 for PMO hrs," plus "[f]acilities cost (bank signage, vendor expense and supplies)" of $59,463 at the smaller of the two banks and $761,071 at the larger one. (*Id.* at 2.) The total is $989,420 for converting both banks, but obviously there was an enormous disparity in the "facilities cost" between the two locations. Moreover, Mr. Westhues testified that changing the "Mortgage Central" signage at the North Nevada location and at least one other Colorado location cost about $18,000 in total. And Defendants' manager for Colorado operations, Ms. Stout, testified that the signage change cost somewhere between $14,000 and $17,000.

In other words, Defendants' evidence does not assist the Court in understanding the burden Defendants would face to change the North Nevada location to a different name. But at least the following is clear:

First, the bulk of the harm to Defendants is quantifiable—actual dollars Defendants will need to pay to make the conversion happen. And Defendants have a trademark infringement insurance policy with a $100,000 deductible. (*See* ECF No. 53 at 12–13.) Although insurance proceeds are not "free money" and insurance companies sometimes deny coverage, the fact remains that a policy exists that appears to cover the hard costs at issue here, above $100,000.

Second, to the extent there is unquantifiable harm to Defendants' reputation, the North Nevada location is currently less than a year old. Whatever reputation Defendants have built there is comparatively very shallow when viewed alongside the reputation Plaintiff has built in El Paso County over the last decade. Thus, Plaintiff

stands to lose much more in this regard than Defendants.

Third, Defendants know how to convert bank branches to operate under new names. They did it for many bank branches in 2014 and 2015 under a well-thought-out and efficient system, and they have preserved what they learned from that experience. (*See* DX A-10, A-12.)

Fourth, Defendants know how to operate banks under separate names. They operated under several names before 2014 and 2015, and they still operate branches under two names—Central Bank and Jefferson Bank.

Fifth, Defendants elected to expand into Colorado Springs under the "Central Bank" name, and did so under their general expectation that they will encounter other "Central" banks wherever they expand. Defendants have therefore assumed the risk of creating the very sort of problem at issue here. Plaintiff perhaps assumed small amount of similar risk by choosing to call itself "Central," which is relatively common in bank names. Accordingly, it may have been foreseeable that some other "Central" bank might attempt to expand into Colorado. But there were no other "Central" banks in Colorado when Plaintiff opened its doors, and Plaintiff built its brand in El Paso County, undisturbed, for eight-and-a-half years before Defendants arrived.

For all these reasons, the Court finds that Plaintiff has made a strong showing that the balance of harms tips in its favor. The Court fully understands that a name change requires approval of various regulators and that executing the name change takes some months of preparation. Again, however, Defendants have done this many times before, and so there is no reason to believe that it cannot be done again. It does not raise a question of whether an injunction should issue, but only of how the injunction

should be fashioned, which the Court addresses below.

## VII.  PUBLIC INTEREST

The public interest favors an injunction here.  The consequences of confusion in the banking industry are potentially much greater than the consequences of confusion in, say, the clothing industry.  As emphasized by Mr. Grebe (manager of Plaintiff's mortgage division), banking documents tend to contain important and highly confidential financial information about banking customers.  It is important to minimize the circumstances in which such private information is accidentally disclosed.

\* \* \*

In sum, Plaintiff has satisfied all four preliminary injunction factors.  A preliminary injunction will issue upon terms the Court will set in consultation with the parties.

## VIII.  BOND

The Court must normally impose a bond on the plaintiff as a condition of preliminary injunctive relief.  *See* Fed. R. Civ. P. 65(c).  On the present record, the Court finds that the amount of Defendants' insurance deductible—$100,000—is the appropriate bond amount.  Should Defendants' insurance carrier dispute coverage for amounts in excess of the deductible (assuming any), Defendants may move to modify the bond amount to account for the risk that Defendants might not receive the insurance proceeds they would otherwise expect.

## IX.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.     Plaintiff's Motion for Preliminary Injunction (ECF No. 16) is GRANTED to the
        extent Plaintiff seeks to enjoin Defendants from conducting business as a full-

service banking branch located within El Paso County, Colorado, under the names "Central Bank" or "Central Trust Bank," but otherwise DENIED;

2.  Most of the terms of the Court's preliminary injunction must be set by later order after consultation with the parties, but, upon Plaintiff's posting of a $100,000 bond, Defendants are immediately ENJOINED to begin the internal preparations necessary to convert Defendants' "Central Bank" branch at 5278 North Nevada Avenue, Colorado Springs ("North Nevada Branch"), to a different a name;

3.  On or before **May 22, 2019**, Defendants shall file a status report describing, in good faith, a realistic timeline and necessary steps (assuming that regulatory approval is not unusually delayed) for completing the conversion of the North Nevada Branch to a different name as soon as practicable;

4.  On or before **May 29, 2019**, Plaintiff may respond to Defendants' status report;

5.  After receiving Defendants' status report and Plaintiff's response, the Court will amend the preliminary injunction to establish dates certain by which Defendant must accomplish the various steps leading to conversion of the North Nevada Branch, and the conversion itself.

Dated this 8th day of May, 2019.

BY THE COURT:

William J. Martinez
United States District Judge